**Kathy COLEMAN, Plaintiff,**

**v.**

**Brian WIRTZ, et al., Defendants.**

**No. C89–1096.**

United States District Court,
N.D. Ohio, E.D.

Aug. 10, 1990.

**436**

Cynthia Darlene Smith, Cleveland, Ohio, for plaintiff.

Mary Lentz, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for defendant Brian Wirtz.

Richard Humphries, Duvin, Cahn & Barnard, Cleveland, Ohio, for remaining defendants.

## MEMORANDUM AND ORDER

BATTISTI, District Judge.

In this teacher's lawsuit involving serious wrongs to the Plaintiff Kathy Coleman ("Coleman"), Defendant Principal Brian L. Wirtz ("Wirtz"), Cleveland Public School Superintendent Dr. Alfred D. Tutela ("Superintendent Tutela"), Cleveland Board of Education President Ralph J. Perk, Jr. ("Perk") and the Board of Education of the Cleveland City School District ("Cleveland School Board") have separately filed, pursuant to Fed.R.Civ.P. 12(b)(6), Motions to Dismiss. Defendant Wirtz has filed a Motion for a Protective Order on the basis of qualified immunity.[1] On July 19, 1990, Plaintiff Kathy Coleman filed a Motion for Leave to file an Amended Complaint, which, except for showing that Coleman has now obtained her right to sue letter, is nearly identical to the original Complaint; all Defendants have opposed leave, and have renewed their Motions to Dismiss. For the following reasons: 1) leave to File the Amended Complaint is GRANTED; 2) in the exercise of discretion, the pendent state law claims in this case are DISMISSED without prejudice; and 3) the § 1983 claims against all Defendants are DISMISSED under Fed.R.Civ.P. 12(b)(6).

**1.** The resolution of the constitutional claims against Wirtz moots any decision as to qualified immunity.

### A. Facts

Coleman, a black female citizen of the United States, has been a teacher in the Cleveland City School District since 1986. Amended Complaint at ¶¶ 4, 7. She was a high school teacher at John Marshall High School during the events giving rise to this litigation. *Id.*, at ¶ 4. Defendant Brian Wirtz was the Principal at John Marshall High School and Coleman's supervisor. Wirtz, a male of unalleged race, is over six foot tall; Coleman is a more diminutive, five feet two inches. *Id.* at ¶ 16.

The alleged tensions between Wirtz and Coleman apparently began in 1988 when she and three colleagues organized a student field trip to London, England and Paris, France, called "the London Connection." *Id.* at ¶ 7. Coleman acted as spokesperson for the London Connection; three other faculty members acted as bookkeeper and educational consultants. Coleman and her colleagues "submitted a fund raising strategy to the Finance Committee [of the Cleveland School Board], developed a proposal in cooperation with the Department of Research and Analysis for Foundation, corporate and community support and secured the endorsement of the defendant superintendent." *Id.*, at 8. They also organized a student group, enlisted the support of the parents, and sponsored activities for fundraising "without specific regulations promulgated by the administration and ... employed the identical procedures previously used by John Marshall personnel." *Id.*, at ¶¶ 8–9. In November, 1988, the London Connection sponsored a basketball game and raised approximately $1,600. Thereafter, Wirtz "berated" Coleman over the number of persons in attendance and "embarked upon a course of conduct," essentially to harass Coleman and to remove her as spokesperson from the London Connection.; he was "pestering" her by forcing her to "submit up-dated accounting of the funds raised," "tormented [Coleman] on numerous occasions with the threat of removing her as spokesperson for the trip," and "haunted her with bare unsup-

ported accusations of unprofessional behavior." *Id.* at ¶¶ 9–14. Despite this action, the area superintendent confirmed and validated Coleman's role in the London Connection.

Early on March 1, 1989, Wirtz, Coleman, and another teacher and union delegate, Mr. Latkovic, met concerning Coleman's role in the London Connection; allegedly, Wirtz tried to usurp and delegate Coleman's role in the trip. Without her union representative, Coleman tried to leave; Wirtz threatened her that she must report to a meeting at the cluster office the next morning or "stay out of the building." *Id.*, at ¶ 16. Several hours later, at around 12:25 p.m., Wirtz, along with Latkovic, went to Coleman's classroom and invited her to step into the hallway; the same conversation regarding the meeting the next day occurred. When Coleman

> turned and walked toward the door, without explanation Defendant Wirtz dashed in front of it. As she reached for the door knob, Defendant Wirtz pushed her away twice, even though she pleaded that her purse was in the room. When he pushed her away the third time, Plaintiff said, "Don't touch me, I've done nothing wrong." The look in his eyes frightened her. Defendant Wirtz responded, "Get security, I want her removed," as he proceeded to attempt to pull her down the hall. Hearing the commotion, one of the students opened the classroom door and [Coleman] fled to her desk and gathered her belongings with the Wirtz in hot pursuit. He grabbed her shoulder and arms and began to drag her towards the door. A security guard and Mrs. Jackson [another teacher] attempted to pull ... Wirtz off of [Coleman], but he continued to drag her toward the door, stepping on her feet and humiliating her in front of her students. [Coleman] was eventually freed from ... Wirtz' grasp but her nylons were ripped and her foot was injured.

*Id.* at ¶ 16.

Additionally, Coleman alleges that she suffered embarrassment, humiliation, fear, anxiety, loss of sleep and appetite. Super-

intendent Tutela allegedly was "apprised of the March 1st incident," but took no action, even after criminal proceedings were initiated against Wirtz. *Id.*, at ¶ 19–20. Superintendent Tutela and the Cleveland School Board "failed to adequately prepare" Wirtz as to "the appropriate policy and procedures for disputes"; thus, they allegedly breached their duty to enforce the collective bargaining agreement between the Cleveland School Board and the Cleveland Teachers Union Local 279. *Id.*, at 19.

Nearly three months later, on May 26, 1989, Coleman was transferred to the cluster office while Wirtz remained at his post. On June 9, 1990, Coleman filed this lawsuit in federal court. In her Amended Complaint, filed July 19, 1990, Coleman alleges federal causes of actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and deprivations of her Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983. She seeks monetary and equitable relief. She also alleges pendent state law claims for assault and battery, intentional infliction of serious emotional distress, negligence, and libel *per se.* Amended Complaint ¶¶ 1–2, 22–25.

### B. Subject Matter Jurisdiction

This Court has subject matter over the Title VII claim under 42 U.S.C. § 2000e–5(f)(3), and over the § 1983 claims under 28 U.S.C. § 1343(a)(3)–(4). The state law claims, asserted against Defendant Wirtz, Tutela, and the Board, purportedly arising from a common nucleus of operative fact, invoke pendent-claim jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

After reviewing the pleadings and pending Motions in this case, as well as the discussions at pretrial on June 26, 1990, the Court has determined that the state law claims seem to predominate, and the constitutional claims under § 1983 seem to be, somewhat attenuated. Although Coleman's Amended Complaint properly intro-

duces the Title VII claim into the lawsuit,[2] the relation between these federal claims, and the more dominant state law claims against the Defendants requires careful examination as pendent claim jurisdiction and subject matter jurisdiction.

In *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), Justice Marshall summarized *Gibbs, supra*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), which held that under Article III, federal courts had the judicial power to exercise subject matter jurisdiction

> over an entire action, including state law claims, whenever the federal-law claims and state-law claims in the case "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." 383 U.S., at 725 [86 S.Ct. at 1138, 16 L.Ed.2d 218]. The Court intended this standard not only to clarify, but also to broaden, the scope of federal pendent jurisdiction.... According to *Gibbs*, "considerations of judicial economy, convenience and fair-

ness to litigants" support a wide-ranging power in the federal courts to decide state-law claims in cases that also present federal questions.

At the same time, however, *Gibbs* drew a distinction between the power of a federal court to hear state-law claims and the discretionary exercise of that power. The *Gibbs* Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties. For this reason, *Gibbs* emphasized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* Under *Gibbs*, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have

---

**2.** In the original Complaint, Coleman filed a Title VII claim **prior to obtaining her right to sue letter from the EEOC.** The defendants moved to dismiss, arguing that it was both procedurally and jurisdictionally improper under 42 U.S.C. § 2000e–5(f)(1).

Although Coleman styled her Complaint as one for injunctive relief, no Motion for a Preliminary Injunction was ever filed. Thus, the Court agrees that the failure to obtain the right to sue letter was procedurally defective because this procedural error frustrates the Title VII administrative scheme favoring conciliation and mediation. Whether this failure is jurisdictionally fatal, as in subject matter jurisdiction, presents another, thorny matter. If defendants can waive this irregularity, or be estopped from arguing such, then it hardly seems jurisdictional—for subject matter jurisdiction can never be waived. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3522 at 66–67 (2d ed. 1984). For example, failure to file suit within 90 days after receipt of the right to sue letter is analyzed not as a jurisdictional requirement, but as a statute of limitations defense subject to waiver, estoppel, or equitable tolling in limited and appropriate circumstances. *Crown, Cork & Seal v. Parker*, 462 U.S. 345, 349 n. 3, 103 S.Ct. 2392, 2395 n. 3, 76 L.Ed.2d 628 n. 3 (1983); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 1135, 71 L.Ed.2d 234 (1982).

In *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486–1488 (6th Cir.1989) the Court examined whether the failure to receive a right to sue letter is a jurisdictional prerequisite, which, if not met, would divest a federal court of subject matter jurisdiction, or, a condition precedent, similar to a statute of limitations, subject to waiver, estoppel, or equitable tolling. The Court noted that every other Circuit faced with this question had held that "the receipt of a right-to-sue letter prior to the filing of a Title VII action is not a jurisdictional prerequisite, but rather a precondition subject to equitable tolling and waiver." *Id.,* at 1487 (citing cases from six other Circuits).

Although the Court in *Puckett* left the question open, the weight of authority, and the discussion in that opinion seem to treat the failure to receive the right to sue letter as a procedural defect.

When this case was originally filed, subject matter jurisdiction was apparently invoked under 28 U.S.C. § 1343 against all Defendants. The procedurally defective Title VII claim was not necessary to sustain federal jurisdiction over the Defendant School Board. Since leave to file the Amended Complaint has been granted, a Title VII claim is properly before the Court.

dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice. (footnote omitted)

*Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 349–350, 108 S.Ct. 614, 618–619, 98 L.Ed.2d 720 (1988) (Emphasis supplied).

■ *Cohill* and *Gibbs* stated **that pendent claim jurisdiction is discretionary, not of right;** the Supreme Court has recently cautioned that this jurisdictional grant, as a creature of case law, is not derived from a statutory, "affirmative grant." [3] *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 2009, 104 L.Ed.2d 593 (1989); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567.2 (Supp.1990 at 25–26 & n. 46).

Discretion, and concerns about judicial economy, fairness and principles of comity, are present in a number of § 1983 cases alleging sometimes novel, but also somewhat attenuated and amorphous "constitutional" torts. The underlying procedural history in *Braley v. City of Pontiac*, 906 F.2d 220, 222 (6th Cir.1990) underscored these concerns. When that case was originally filed in federal court, styled, *Braley v. Helgemo, et al.*, Case No. 84–CV–5197–DT, then District Judge Guy, *sua sponte*, dismissed the pendent state law claims (e.g., malicious prosecution), which were refiled in state court; several years later, after a jury verdict in state court, the remaining federal issues were resolved. Relying on *Gibbs*, Judge Guy described a hypothetical, but typical, case of an arrest and prosecution by a local government, which results in a § 1983 lawsuit with pendent state law claims both predicated on excessive force, false imprisonment, and malicious prosecution. Because the claims grew out of the same situation, "this would suggest, if looked at superficially, that judicial economy as well as convenience of the parties would be best served by trying these matters together." *Braley*, No. 84–CV–5197, slip op. at 3. Judge Guy proceeded to explain several reasons why judicial economy would not be best served.

■ First, the state law claims may become unnecessary,[4] and are often voluntarily dismissed after the federal claims survive a defendant's motion for a directed verdict; second, because the federal claims and state claims "are not congruent [concerning] elements, remedies, and defenses," there is a substantial risk of jury confusion. *Braley v. Helgemo*, No. 84–CV–5197–DT, slip op. at 4 (E.D.Mich. January 23, 1985). Although Judge Guy wrote about jury confusion under Michigan law, there is equally a substantial risk of jury confusion under Ohio law. Although

3. In *Finley v. U.S.*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the Supreme Court repeated the general rule that federal jurisdiction derives from Article III and a jurisdictional statute: "The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it." *Id.*, at ——, 109 S.Ct. at 2006, 104 L.Ed.2d 593. Thus, the Court held that pendent-party jurisdiction was impermissible under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.*, a statute within the exclusive jurisdiction of the federal courts, that pendent-party would not be inferred by broadly construing jurisdictional statutes, and that instead of looking to see whether pendent-party jurisdiction has been "expressly or by implication negated," there must be an "affirmative grant" from Congress. *Finley, supra*, at ——, 109 S.Ct. at 2009, 2019, 104 L.Ed.2d 593; 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure*, § 3567.2 (1990 Supp. at 25–26).

The Court also stated that several court-created, jurisdictional doctrines were not completely faithful to the general rule. Ancillary juris-diction is confined to "a narrow class of cases." *Finley, supra*, at ——, 109 S.Ct. at 2008, 104 L.Ed.2d 593; 13B C. Wright, A. Miller, & E. Cooper, *Federal Practice, supra*. As to pendent claim jurisdiction, the Court wrote: "The Gibbs line was a departure from prior practice, and a departure that we have no intent to limit or impair." *Id.*, at ——, 109 S.Ct. at 2010.

4. Judge Guy noted the response of lawyers to the question, why are the state claims necessary at all:

When this question is put to plaintiff's counsel, they frequently have no answer other than that lawyers always proceed from an excess of caution and plead as broadly as possible. Other counsel who are more candid concede that, although as a rule they would prefer to try personal injury type cases in the state courts before state juries, the federal lure is the award of attorney fees made possible by 42 U.S.C. § 1988.

*Braley v. Helgemo, et al.*, No. 84–CV–5197–DT, slip op. at 4 (E.D.Mich. Jan. 23, 1985) (Guy, J.).

§ 1983 municipal liability may not be predicated on *respondeat superior,* under Ohio law, municipalities could be vicariously liable for the intentional acts of their employees when that conduct was "expectable." *See Stallworth v. City of Cleveland,* 893 F.2d 830, 834 (6th Cir.1990) (Gillmore, J.) (summarizing *Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989)). Furthermore, as to the elements, remedies, and defenses, Judge Guy noted the differences between common law or state law torts and "constitutional torts":

> Insofar as state tort claims are concerned, it is easy enough to describe the common law tort of false arrest. The problem comes from the fact that the plaintiff has undoubtedly proceeded on the theory that if he can demonstrate a common law false arrest, he has also met his burden of demonstrating a § 1983 violation. This, however, is simply not the case, although, once again, the failure of the courts to adequately define the perimeters of § 1983 action is the root of the problem and not necessarily any negligence on the part of plaintiff's counsel.
>
> \* \* \* \* \* \*
>
> Thus, the jury's first determination will be whether there is a violation of the state law relative to false arrest. If they answer that question "yes," then they must turn to the federal claim and determine if the circumstances of the arrest "shock[s] the conscience," the test suggested in *Rochin v. California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1962).....
>
> [T]he assault and battery/excessive force claim must next be examined. In terms of the § 1983 claim, this is not a complicated exploration in and of itself. The words assault and battery, for example, do not even have to be used, nor does the court need to point out that "assault" and "battery" are two different torts with two different definitions. All that need be said is that if they find that the

officers used more force than was justified under the circumstances, to the degree that it was shocking to the conscience, then they may find a violation. On the state assault and battery claim, however, the court must define both "assault" and "battery" even though the plaintiff is usually only talking about a battery. It then must be made clear that the "unpermitted touching" which would constitute a battery under state tort law would not necessarily be the kind of excessive force which would ground § 1983 liability. **The classic example of the "stolen kiss" being a battery would hardly be the basis of a § 1983 action even under the most liberal interpretation of that statutory action. We are asking the jury to make distinctions without being able to give them adequate definitions to use in making the distinctions. Here again, the danger exists that if they find a battery, they will also find a § 1983 action, or conversely, if they do not find "excessive force," they may find against the plaintiff on this state law claims even though he has enough evidence of an unpermitted touching to prevail.**

*Braley,* No. 84–CV–5197, slip op. at 10–13.

Judge Guy concluded that "since the plaintiff is free to pursue his state court claim in state court, there is no reason to turn litigation bottomed on a federal jurisdictional basis into this kind of a morass." *Id.,* at 18.

■ One factor that has made Courts reluctant to dismiss pendent state law claims is the potential bar of statutes of limitations for state law claims; especially, because of the press of criminal and complex cases, it may take more than a year for a Court to adjudicate pending motions. In Ohio, the intentional torts are one or two years. *See* Ohio Rev.Code Ann. §§ 2305.-10–11. But in *Cohill, supra,* the Court noted that many states have savings clauses for statute of limitations. Ohio has such a clause—Ohio Rev.Code Ann. § 2305.19 [5]

---

**5.** Ohio Rev.Code Ann. states, in pertinent part:

In an action commenced, or attempted to be

commenced, if in due time a judgment for the

Thus, principles of comity should make federal courts, applying Ohio law, less reluctant to dismiss pendent claims in appropriate cases.

 Several other Courts have interpreted *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139–40 as allowing courts, in their discretion, to dismiss, *sua sponte*, pendent state law claims under certain factors. In *Sullivan v. Boettcher & Co.*, 714 F.Supp. 1132, 1133–34 (D.Colo.1989), Judge Carrigan listed the several factors to guide the courts' discretion: 1) judicial economy, 2) availability of a surer-footed reading of state law in state court, 3) predominance of state issues compared with federal issues 4) broader scope of remedies available under state versus federal law, and 5) the potential for jury confusion. See *Trejo v. Wattles*, 636 F.Supp. 992, 995 (D.Colo.1985) (Kane, J.) (risk of jury confusion, state law claim has broader remedy than federal civil rights claims); *Upah v. Thornton Development Authority*, 632 F.Supp. 1279, 1281–82 (D.Colo.1986) (Kane, J.) (same reasons); *Whitman v. Connecticut Bank and Trust Co.*, 400 F.Supp. 1341, 1346–47 (D.Conn. 1975); *Kerby v. Commodity Resources Inc.*, 395 F.Supp. 786, 789–90 (D.Colo.1975) (Matsch, J.) (Criticizing "simplistic" notion of judicial economy, stating the "quality of litigation is as important as the quantity of cases," and noting attempt to expand scope of federal remedy, unsettled area of state law, and jury confusion as factors); *Solevo v. Aldens, Inc.*, 395 F.Supp. 861, 863

(D.Conn.1975) (Exclusive federal claim, predominance of state claims).

Applying the factors in *Sullivan, supra,* and *Braley, supra,* this Court determines that the state law claims predominate, there will be a surer footed reading of state law in state court, the state law claims have broader and different elements and remedies than the federal claims, there is a risk of jury confusion, and principles of comity to the states are strong.

Accordingly, in the exercise of discretion, pendent jurisdiction is declined and the pendent state law claims against all Defendants are DISMISSED without prejudice.

### C. Defendant Perk

Because both the Complaint and Amended Complaint do not assert any claims or demand judgment against Defendant Ralph J. Perk, Jr.—see Fed.R.Civ.P. 8(a)(2)–(3) he must be DISMISSED from this lawsuit. Fed.R.Civ.P. 12(b)(6).

### D. § 1983 claims against Wirtz, Tutela, and the Cleveland School Board

#### 1. Capacity

 The Complaint and the Amended Complaint fail to specify whether Tutela and Wirtz are being sued in their official or personal or individual capacities. In § 1983 actions, these distinctions are analytically important for at least three reasons: jurisdiction, the burden of proof, and immunity defenses.[6]

plaintiff is reversed, or if the plaintiff fails otherwise than upon the merits, and the time limited for the commencement of such action at the date of reversal or failure has expired, the plaintiff ... may commence a new action within one year after such date ...

Under *Cero Realty Corp. v. American Manufacturers Mutual Insurance Co.,* 171 O.St. 82, 167 N.E.2d 774 (1960), the Ohio Supreme Court listed four factors to satisfy the statute: 1) the action must have been commenced or attempted to be commenced within the applicable statute of limitations; 2) the failure of the plaintiff in the action was otherwise than upon the merits; 3) at the date of such failure, the time limit for commencing the action has expired; and 4) the plaintiff refiled the action within one year of such failure. See also *Harris v. City of Canton,* 725 F.2d 371, 375 (6th Cir.1984).

**6.** Since *Will v. Michigan Dept. of State Police,* —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45

(1989), state officials sued in their official capacity for damages, (which are treated as suits against a "state"—*Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)), are absolutely immune from liability under the jurisdictional bar of the Eleventh Amendment. (Additionally, and just as importantly, states, or, as pleaded another way, state officials sued in their official capacities for damages, are not "persons" under § 1983; state officials sued in their personal or individual capacity for damages are "persons" who can be held liable for damages. *Will, supra.*)

The Sixth Circuit, following *Will, supra,* and *Nix v. Norman,* 879 F.2d 429 (8th Cir.1989), requires plaintiffs seeking damages from state officials under 42 U.S.C. § 1983 to "set forth clearly in their pleading that they are suing the

In addition to the jurisdictional issue of the Eleventh Amendment issues—*see Wells v. Brown*, 891 F.2d 591 (6th Cir.1989) and footnote 6 of this Memorandum and Order, there are other important analytic differences between an official and individual capacity suit. First, and foremost, there is a different degree of proof. *See Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Second, in suits brought against governmental officials in their official capacities, or a named governmental entity itself, "the governmental entity is not entitled to assert the immunity defenses [e.g., qualified immunity] available to individual actors sued in their individual capacities." *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (citing *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)).

In *Scarpa v. Murphy*, 624 F.Supp. 33 (D.Mass.1985), Judge Freedman, noting the importance of this distinction, was similarly faced with an unclear Complaint; he assumed, "for purposes of analysis that plaintiff has sued these defendants in both capacities." *Id.* at 36. Following *Scarpa*, and the mandate of Rule 8(f), this Court will assume both.

### 2. Rule 12(b)(6) standard

■ In analyzing a Motion to Dismiss under 12(b)(6), "the court must accept as true all factual allegations in the complaint"—*Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984), and "must deny the motion to dismiss unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277, 279 (6th Cir.1987) (*en banc*). To state a claim under § 1983, a person acting under color of law must cause a deprivation of a federal constitutional or federal statutory right. *Golden Gate Transit Corp. v. City of Los Angeles*, —— U.S. ——, ——, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555, 557 (1980).

### 3. Individual Liability of Wirtz and Tutela

The constitutional rights, now identified and pleaded in the Amended Complaint, purportedly invoke the Fourth and Fourteenth Amendments of the Constitution.

■ Coleman alleges that Wirtz, acting under color of law, violated her constitutional rights under the Fourth and Fourteenth Amendment. Wirtz is also alleged to have committed the tort of assault or battery by dragging Coleman from her classroom. This constitutional claim would

---

state defendants in their individual capacity for damages." *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir.1989) (Merritt, C.J.). Because the Eleventh Amendment is "an immunity from suit" in the federal courts and a jurisdictional bar to certain remedies, the Court stated that Rule 9(a) ("It is not necessary to aver the capacity of the party ... to be sued ... except to the extent required to show the jurisdiction of the court") would "require plaintiffs to properly allege capacity in their complaint." *Wells, supra,* at 593.

Although this lawsuit is not a suit against state officials, but municipal officials, and pleading capacity is not mandated by Rule 9(a), *Wells* stated:

> Although modern pleading is less rigid than in an earlier day, *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957), we have not let down all pleading barriers. It is not too much to ask that if a person or entity is to be subject to suit, the person or entity should be properly named and clearly notified of the potential for payment of damages individually. *Brandon v. Holt*, 469 U.S. 464, 474, 105 S.Ct. 873, 879, 83 L.Ed.2d 878 (1985) (Burger, J., concurring in the judgment.)

*Wells, supra,* at 593. See also *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (quoting Chief Justice Burger and noting the same pleading concerns).

Although in this case, the local governmental unit is a named defendant, the capacity ambiguity lies primarily with the individual defendants, Wirtz and Tutela. Official capacity suits and individual capacity suits have differences in the proof, and, in individual capacity suits, the qualified immunity defense may be raised.

Although no rule of pleading requires it, a short, simple statement whether the defendant is sued in his or her individual or official capacity would greatly facilitate resolution of civil rights lawsuits. For the trial courts, poor pleading, as here, spawns confusion, more motions, and expends valuable judicial time.

be analyzed as an excessive force claim, brought under the Fourth Amendment—*Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), or under the so-called, substantive component of the Due Process Clause of the Fourteenth Amendment. *Graham* held that excessive force claims brought against law enforcement officials are to be analyzed under the "objective reasonableness" standard of the Fourth Amendment, not under a substantive due process standard. In the non-law enforcement context, it is not clear whether the Fourth Amendment, or the substantive due process standard applies; Sixth Circuit case law presumes that the substantive due process claims have survived. *See Pleasant v. Zamieski,* 895 F.2d 272, 276 n. 2 (6th Cir.1990) (Martin, J.); *Braley v. City of Pontiac,* 906 F.2d 220, 225–26 (Boggs, J.) (The "shocks the conscience standard [is] fuzzy under the best of circumstances." Although in *Braley,* two judges found it unnecessary to decide the case on substantive due process, Judge Nelson wrote:

I must take it as given that the Due Process Clause does in fact have what the Supreme Court calls a "substantive component," *see DeShaney v. Winnebago County Department of Social Services,* [489 U.S. 189], 109 S.Ct. 998, 103 L.Ed.2d 249] (1989), and that circumstances can exist in which a person might be found to have been deprived of liberty without "substantive due process of law." But I am reluctant to try to come to grips with that "ephemeral concept," as we called it in *Gutzwiller v. Fenik,* 860 F.2d 1317, 1328 (6th Cir.1988), absent a clear necessity for doing so.

*Braley,* 906 F.2d at 228 (Nelson, J., concurring).

Although it is probably a given, under existing precedent—*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (police forced emetic into a suspect's stomach to retrieve evidence for a narcotics

case)—that some assaults and battery claims may rise to a constitutional magnitude, the allegations in this case do not rise to that level. Unless some higher standard than state law is involved, almost any assault and battery claim—including the stolen kiss—with a little bit of lawyering, could be "constitutionalized," because the force applied could be deemed to be "excessive" or "shocks the conscience." [7] As this Circuit recognized, "[t]he protections of the Constitution are not coextensive with the protections of the common law." *Braley, supra,* 906 F.2d at 225. In *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), Justice Rehnquist wrote:

§ 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble,* 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251] (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

If, however, the excessive force claim is analyzed under the Fourth Amendment, there must be a "seizure" that is unreasonable. *Pleasant v. Zamieski,* 895 F.2d 272, 277 (6th Cir.1990) (citing *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). A seizure is not enough; it must be unreasonable; furthermore, the reasonableness must be "judged from the perspective of a reasonable officer on the scene, rather, than the 20/20 vision of hindsight." *Pleasant,* 895 F.2d 272 at 276 (quoting *Graham, supra.*).

*Graham* has been applied to deadly force cases involving law enforcement officers;

---

**7.** Just last year, the late Judge Freeman pointed stated:

The court queries as to whose conscience is shocked—the judge's, the community's conscience at large, or perhaps the individual juror's. *See, e.g., Gumz, supra,* 772 F.2d at

1406–07 (Easterbrook, J., concurring) (... "[s]ubstantive due process is shorthand for a judicial privilege to condemn things the judges do not like or cannot understand"). *Zumbroegel v. City of Dearborn Heights,* 705 F.Supp. 358, 365 n. 6 (E.D.Mich.1989).

this case did not involve deadly force. Accordingly, this Court is reluctant to apply the Fourth Amendment to Coleman's claims against Wirtz.

The next issue is gleaning the particular federal constitutional claims against Superintendent Tutela and the Cleveland Board of Education.

In the Amended Complaint, Coleman alleges:

19. Although apprised of the March 1st incident, Defendant Superintendent took no action until May 26, 1989, when he advised Plaintiff that she had been "reassigned" to the cluster office and should not report back to John Marshall High School. The Defendant Superintendent and Board of Education failed to adequately prepare the Defendant Wirtz on the appropriate policy and procedure for addressing disputes. By failing to do so, these defendants breached their duty to enforce and support the collective bargaining agreement between the Board of Education of the Cleveland City School District and the Cleveland Teachers Union Local 279, American Federation of Teachers, AFL–CIO. As a result, the Plaintiff sustained an assault on her person, the intentional infliction of serious emotional distress and defamation.

20. Defendants Tutela and Board of Education acquiesced and ratified Defendant Wirtz' sexual intimidation by failing to establish a policy to address the issue of assault on a teacher by a board employee or administrator, although there is a policy for attacks on teachers by students. These Defendants falsely portrayed Defendant Wirtz as a victim by disciplining the Plaintiff and transferring her to the cluster office while the perpetrator of the attack was ignored, even after criminal proceedings were initiated.

Assuming Defendant Tutela is sued in his personal capacity, the claim against him, essentially, is that he failed to address Coleman's grievances against Wirtz pursuant to the collective bargaining agreement, and retaliated against Coleman by reassigning her several months later to the district cluster office. Coleman argues that the collective bargaining grievance procedures are due process rights equivalent to constitutional rights.

■ If Coleman is arguing for supervisory liability—*Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), which, under § 1983 would also hold Tutela personally liable, the Supreme Court has rejected *respondeat superior* liability for supervisory officials on the mere failure to act. *Id.* The mere failure to supervise or properly train under § 1983 cannot be based upon simple negligence. As this Circuit has stated:

[A] failure of a supervisory official to supervise, control, or train the offending individual [employees] is not actionable absent a showing that the official either encouraged or in some way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees].

*Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir.1989) (quoting *Hays v. Jefferson*, 668 F.2d 869, 872 (6th Cir.1982), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982)).

There are no allegations of widespread, prior constitutional violations by subordinates. Tutela's alleged actions occurred *after* the Wirtz assault and battery; there are no allegations that he implicitly authorized, approved, or knowingly acquiesced in Wirtz' behavior prior to Wirtz' attack. Thus, as a matter of law, there can not be supervisory liability under § 1983. *Dunn v. Tennessee*, 697 F.2d at 128.

As to any specific constitutional rights Tutela himself violated, Coleman argues that he violated her procedural due process rights because he would not act upon her grievance or enforce the provisions of the collective bargaining agreement between the Cleveland Teacher's Union and the Cleveland School Board. Even assuming, *arguendo*, that the contract rises to a constitutionally protected property or liberty interest, there are no allegations that the contract fails to provide process or adequate process. Although Coleman alleges

that the reassignment or transfer, several months later, after the initiation of criminal proceedings, violated due process, there is no allegation that she would not have a post-deprivation remedy. Even if the contractual right is deemed a constitutional property interest or a liberty interest—and there is no need to decide this issue—there is a post-deprivation remedy under the agreement. Under *Wilson v. Beebe*, 770 F.2d 578 (6th Cir.1985) (*en banc*) there can be no violation or procedural due process.

Accordingly, since the Complaint fails to state constitutional claims against Wirtz and Tutela in their personal capacities, these claims are DISMISSED. There is no need to address the qualified immunity issue here.

#### 4. Official Capacity Suits, Municipal Liability

■ Suits against municipal officials, acting under color of law, in their official capacity are deemed suits against a municipality because any relief will come from the municipal treasury. *Brandon v. Holt, supra*. Therefore, the claims are analyzed as claims against the municipality, here, the Cleveland School Board.

■ The actions of the Cleveland School Board are alleged to be claims for the failure to act, failure to train or prepare Wirtz as to the policy for addressing disputes, failure to adopt a policy for attacks by board employees against teachers. What specific right under the Constitution is violated is difficult to grasp from Coleman's briefing. It appears, from context, that this is a Fourth or Fourteenth Amendment argument.

To hold a municipality liable under § 1983 under a failure to train theory (which is one way of framing a "policy or custom"), it must amount to "deliberate indifference" towards the rights of others:

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989).

The allegations sound only in negligence. Therefore, no constitutional claim is stated against the Cleveland School Board.

The Amended Complaint and much of the briefing speak of sexual and racial harassment, disparate and unequal treatment. These allegations are properly addressed under Title VII of the Civil Rights Act. Now that Coleman has her right to sue letter, and has Amended her Complaint to place the Title VII claim before the Court, she can pursue her remedies under that important statute.

#### E. Conclusion

No doubt, if the alleged wrongs to Coleman occurred, they are serious: besides issues of state law, there are issues of human dignity and standards of decency which all persons in this country deserve. However, this Court is, for the most part, the wrong forum; if Coleman can prove her case, appropriate relief will occur in a Court of general jurisdiction.

Accordingly, Leave to Amend the Complaint to invoke the Title VII claim is GRANTED, in the exercise of discretion, the pendent state law claims against all parties are DISMISSED without prejudice; Defendant Perk is DISMISSED, and all § 1983 claims are DISMISSED against remaining Defendants for failure to state a claim upon which relief can be granted.

IT IS SO ORDERED.